Our next case for argument is 21-1211, Amaranth v. Olo. Mr. Weinblatt. Good morning, Your Honors. Excuse me. May it please the Court. The district court incorrectly decided that the asserted claims are directed to, quote, communicating hospitality-related information using a system that is capable of synchronous communications and messaging. In the district court rule, the specification makes it clear that the claims are not directed to IA systems. That's at APPX 13 and APX 14. The prosecution history makes clear that all references to synchronous communications, synchronous operations, and information and management and synchronous communications systems were disclaimed. Okay, so prosecution disclaimer has to be clear and unmistakable. So take me to exactly the prosecution history that you believe clearly and unmistakably disavows synchronicity. If you look at APPX 220 or APPX 585, same page. I'm sorry, what, a little slower, which page? APPX 220 or APPX 585. I have both sites because in the district court, when we had the oral hearing, the stipulation to amend the complaint hadn't been granted yet. So we weren't sure for this appeal which citations you would prefer. So I can give you both, if that's okay. Okay, so here's one thing. I mean, I was working on 585, that's where my notes are. Where is the office action that preceded this response and amendment? I couldn't find it in here. Is there an office action in the appendix that preceded it? It's not in the appendix. Okay, so what was the nature then of the examiner's precise rejection that precipitated, right, if you're gonna say something's a clear and unmistakable disclaimer and you made a change, don't you think it would be relevant for us to know why the examiner was forcing you to make a change? From my perspective, that would have been useful. Well, for Frosky's history disclaimer, there has to be a clear disavowal of claims scope. And here, you have terms deleted. What was the nature of the rejection? Answer my question first, please. There was a 101 rejection. There was an indefinite disrejection. And I believe there was also a prior art rejection. And if you look at APPX 596, you'll see in the remarks, the indefinite rejections are moot without prejudice or acquiescence owing to the present amendments. So these were substantive amendments. I have to ask you, you're going really fast. I'm sorry. Just slow down in your speech and your reference to pages because you're already done with the page before I can even turn to it. So just slow down. You'll have plenty of time, I promise. APPX 596. Okay. In the remarks, there was an indefinite rejection at the top. Got it. APPX 599, there were obviousness rejections. Okay. And in the remarks, you'll see that these claim amendments were substantive. They weren't stylistic. Okay, so would you agree with me that there is nothing in your remarks on the obviousness rejection, a la the prior art rejection, which discusses the synchronization elements? Because they were removed. Yes, but you normally argue, you know, we remove something, this is no longer a limitation. That's why, normally when an amendment is made in order to overcome a particular rejection, the remarks discuss how that amendment overcomes that rejection, right? I don't think that's true in every instance. In APPX 596, dealing with the indefiniteness rejection, quote, the claims are now focused on and directed to the intelligent automated assistant aspect of the invention. And then on the same page, applicant has removed the synchronization term from these claims and has added additional limitation to these claims to moot the patent ineligibility rejections. You're under the patent ineligibility rejection, correct? But above that, the first quote was above that for the indefiniteness rejection. And it says the claims are now focused on and directed to intelligent automated assistant aspects of the invention? Yes. So you, I'm sorry, and you think that that is about synchronization? I think taking all of the amendments together. The problem is, for a prosecution disclaimer, what you do in the prosecution has to be clear and unmistakable to anyone reading it. So I don't see how I could read your remarks with regard to the indefiniteness rejection clearly and unmistakably as dictating the synchronization changes that you made. We'll look at APPX 598. Okay. Thus, clearly, the claims as newly revised are directed to IA functionality based upon rules functionality, which improve the communications and overall functionality of the claim computer system when considered as a whole. Again, that is ambiguous at best as to what it's saying. It certainly would not rise to the level of a clear and unmistakable statement. So, okay, I'll tell you, I'm having trouble finding anything in the remarks that help you. Am I missing any, is there anything else you want to put me to in the remarks? Your Honor, I'm at a loss that when a patent applicant says that claims are directed to a specific feature, how the public is not on notice as to what the inventor or the applicant is doing as what the claims are directed to. Directed to a specific feature. What is that specific feature? IA functionality? The IA functionality. And how does that necessarily require a lack of synchronous operation? You saying it's directed to IA functionality is not the same thing as saying it's directed to IA functionality, which is non-synchronous. What I am saying is that synchronous has a meaning. It's found in other claims. The pre-amended claims use the word synchronous. It also used the word real-time. So Ola was wrong to say that real-time and synchronous are the same. They can't be. There's case law that says when you have two terms in the same claim, they don't mean the same thing unless it's clear. I'm sorry to interrupt, but you said synchronous has a meaning. What does that mean? This was construed by Judge Sobraw dealing with the 077 patent, and Ola wasn't part of that case. What you're holding in your hand is or is not in the appendix that I can look at? It is not in the appendix, but it is from a court case. It's... Involving this or a family patent? Yes, it's the related patent. Okay, so read it to me. I guess I am actually interested. After synchronized and synchronous, the court adopts Amerith and IPDEV proposed construction of these terms, and above it, it's quote, made or configured to make consistent, end quote. That's not real-time, which is what Ola argued at the district court. At the end of the oral argument during their rebuttal period, right before it ended, they said that real-time can be switched for synchronous, and that's not true. Okay, so I'm sorry, can you tell me again what that definition of synchronous was? I'm just struggling to understand it. Made or configured to make consistent. Consistent. What does that mean, consistent? Well, that's something, that's a reason why, one of the reasons why we believe this case needs to be sent back down to the district court. You didn't ask the district court to construe this term below, so you can't ask me now to send it back for construction to be made on the first instance. We also couldn't know that the district court was gonna add a term into the directed to that doesn't exist anywhere in the claims. There is no synchronous term in these claims. Well, but there is concurrently communicate, right? So let's think about that. If you are at a store, and a credit card is swiped, that doesn't need to be processed in real-time, the store can wait until the end of the day and do a batch process. The communication that goes to the credit card company is communicating bi-directionally, but that's not in real-time, because you swiped your card earlier in the day. It's, I'm sorry, wasn't this about putting in your order for food at the end of the day is not gonna help me? It's not solely about putting your order in for food. Remember, we're into, Don't the claims continue to say in real-time? They do say in real-time, but this is my point. In real-time is not the same thing as concurrently. Well, it also isn't the same time as the end of the day, right? Right, you just said it's not in real, I thought that your example was, see, it's not in real-time, it could be at the end of the day. Because in real-time would be at the time you are swiping your credit card. It's be done at that time, that would be real-time. By waiting at the end of the day, that's not real-time, because there's a delay. And the claims talk about real-time. The claims talk about real-time, but your honor. They don't just talk about real-time. They say they communicate bi-directionally in real-time. That means the communication is sent and received and responded to bi-directionally in real-time. That's correct, but that doesn't mean synchronous. That's communicating back and forth. In real-time. I understand that. So you have to, and your honor, there's a mischaracterization of the claims, and that's the same fault that the district court had. These claims are system claims that solve a problem. Remember, we're in 2005. The iPhone didn't even exist then. It came out in 2007. Voice recognition came out in 2008. And that's found in APPX 166 at paragraph 31 to 33. Sorry, wrong slide. APPX 161 at paragraph 22, and APPX 521 at paragraph 22. At the time... Just for my purposes, are these claims limited to voice recognition? Just typing in your order? No. Yes, so at the time in 2005, computers were not able to understand and process both free and fixed format data and then apply intelligent rules to interpret and respond to that data. So in 2005, if you were to try to speak into your phone or send a text message... I just want to get a clearer answer than I... I had understood when I was reading the claims, and just tell me if I'm wrong, that one of the things that could satisfy this claim is a device that had boxes you could check and then another box in which you could type new information like typing in a write-in ballot or in a ballot, right? You have four named candidates and then you can write in somebody, but here, let's even assume you have to do it by typing it in. Is that covered by this claim? That alone is not enough to be covered by the claims. Of course not alone, with all the other stuff. You said voice, voice, voice, voice. You got to have Siri or something like that. And I don't see the requirement that the communication here has to be by voice communication, which some computer has to interpret. Claim 1A has that. Claim 1F... Where, where does it say it? Where? So we have at least one hospitality, software back office application with at least one IA based interface and able to execute one or more rules while communicating the free format messaging. Free format messaging would be something like speech or text message. Something like. Or text. Right, exactly. Well, no, when I say something like, it can be, because you have to remember, prior to that, fixed format meant you're on a website and you have a dropdown that you can select where you're typing in an explicit answer that goes with what they want. It's not the same as you picking up your phone and saying, I want a reservation tomorrow night at the best seafood restaurant in the area. That's what these claims allow to happen. And in 2005, there were implementation problems and that's in the factual record that was ignored by the district court that these claims solved. These are not functional claims. These claims are hardware. It is a system. It's design choice as shown by figure 10. And when one of ordinary skill in the art looks at the specification and sees all 45 examples that inform the person of ordinary skill in the art how to implement the invention, with figure 10, they can go out and make it. The district court held, the claims were directed the abstract idea of communicating hospitality related information using a system that is capable of synchronous communication and messaging. I understand your concern is how can they say that? We deleted the word synchronous throughout prosecution history. What if instead the abstract idea was communicating hospitality related information using a system that is capable of real time bi-directional communications and messaging? You're missing the IAA part of the invention. If you want to change the directed to, you have to include the IAA aspect. That is key. That is what these claims are about. There is nothing in the record saying that the claims are not about them. Even an expert did a declaration looking at what the claims are about and the district court was wrong to toss it because the district court said, I'm gonna look at the object of the invention which isn't even in the claims to then say, this is what the claims are about. The district court was wrong. And your honor, I don't wanna use up all my rebuttal time, so I'd like to reserve it. Okay, sure. Not a problem. Ms. Key. Sorry. Good morning, your honors. And may I just say how nice it is to actually see you again instead of just hear you. Your honors, I think one of the things that also might be helpful regarding the questions you were asking is to look at the end of the claim. We were just told that synchronous means consistent, made or configured to make consistent. If we look at a kind of- I don't even understand that. That makes no sense to me. I'm not sure it does either. But even- Synchronous means at the same time. And you and I agree with that, your honor. But I'm just giving you that the claim also still has the notion of consistency in it. The very last phrase, the where in clause of the claim talks about the fact that the whole reason you're having this bidirectional real-time communication with the back office is so that you can maintain consistency with the master database. And that's at appendix 86, column 22, line 26 through 27. So the concept, even of the notion of synchronous with the definition of maintaining consistency is still in the claim. If we look carefully at the file history, appendix 596 that we were just asked to focus on, what was removed from the claim was just the term synchronization, not the concept, not the notion. Is that still in any of the background of the sort that the chief was asking about what the nature of the rejection was that then led to this change with the associated remarks? Yes, absolutely. In fact, what had happened was there was a rejection based on 101, 112, and 103. In the 101 rejection, what the examiner said was this looks like all it is is synchronizing data. And so rather than take out the concept, they just took out the word synchronizing and said, okay, you said you didn't like the word synchronize, I'm taking out the word synchronize. But that didn't remove what was mandated through the entirety of the specification, which is I'm trying to mimic how a human takes orders for food or takes orders for a reservation, the things that you used to do in pen and paper. In order to do that, I need to have a system that receives communication saying, I'd like to make a reservation. There's a back end that has a record of all of the things that are happening. And in order to make that reservation, you have to know whether or not someone else has already made that reservation. So there is a requirement that the system be continually updated so that there's consistency between what's being asked for and what's being offered. And the abstract uses synchronous twice, right? That's correct. In the first three lines, it talks about synchronous communication and then synchronization. That's correct. But what was going on there was they just, there is. Well, and more than that, there are four objects of the invention, all four of which require synchronization and specification. That's correct. In fact, the one that's a principal object of the present invention. Our present invention language has consistently been used to say, when someone says this is the present invention, or better yet, the principal object of the present invention, that matters. That's correct, Your Honor. That says this is, is, is an important fact there. It is a principal object of the present invention for the entirety of the specification, which then goes on to constantly talk about how you have to make sure you're in synchronization, which again, makes sense. Because how can you give away a table that's already been given away? The whole point of the system is that I am bidirectionally communicating with you in real time so that I'm not giving away a table that's already been reserved by or for someone else. And we know- What about, so, assuming that I was to give meaning to the deleting the word synchronous in the claim at page 585, couldn't the abstract idea be rewritten to cover exactly the same subject matter by replacing synchronous communication with real time bidirectional communication? Absolutely, Your Honor. And that's actually also something that I suggested in oral argument below when we heard this for the very first time. That it was the first time it was ever raised that somehow removing synchronous had some meaning. And I said, you could replace it with real time. Now, the other option, Your Honor- Now, opposing counsel, oh, I'm sorry, go ahead. No, I was just gonna say the other option is if he says synchronous is gone completely, you can leave the abstraction to simply be communicating. It doesn't have to be synchronous. I think that's what we heard today. It could be that you do it in the morning- The idea gets even more abstract. Exactly, Your Honor. And that's my point fundamentally, is that if we remove synchronous from the abstraction, now we have a patent that says its principal object is to provide information management and communication system. And that is even more abstract than something that also required some level of real time or concurrent communication. Your Honor was gonna ask me a question. My next question was gonna be when I rewrote the abstract idea to replace synchronous with real time bidirectional, which comes straight from the claim, opposing counsel's response was, but that doesn't take into account the IAA system. Is there something I'm missing? I don't see some definition for an IAA system in this specification that makes it some sort of particularized piece of hardware or something. What is the IAA system? So, Your Honor, it's nothing. There's nothing in the specification that ever refers to an IAA. There's actually nothing that refers to intelligent anything. Okay, can I just, this may help me. In the claim construction brief, I think by the plaintiff at 303 of the appendix, is a list of, Amaranth admits that at least the following proposed constructions affect the proper analysis of under 101. That's correct. And Judge Stark said he's gonna accept the claim constructions. So number two there is a rule-capable, intelligent automated assistance IAA system, and Amaranth's proposed construction is an integrated framework for a system that enables intelligent choices while executing hospitality tasks in accordance with established rules. Is that the? That's correct, Your Honor. That's the most construction we have. That is the only proffered construction that you have, and it is the construction that we said could be used and that Judge Stark said that he did use. And in fact, that definition is in and of itself abstract. All we have is that it's some framework. We don't know what it is. It could be hardware, software, we don't know. And it's some form of system that allows intelligent choices. We don't know what those are or how those are made while executing hospitality tasks in accordance with rules. Well, simply applying rules according to Your Honor's precedent in Smart Flask and Accenture is itself also abstract. So we have a definition that gives nothing more. Even if it did, there is nothing in the specification that tells one how to accomplish any of that. The only mention we have in the specification anywhere of an automated assistant is in column 15. This is Appendix 83, at lines 11, sorry, 9 through 11. And in fact, in the file history, when they mentioned that they were focusing on an automated assistant, this is the only thing they used for support. And that's at Appendix 596. All we see is, to illustrate by way of example, the computer might speak. Hello, this is your automated reservations assistant. I have a new reservation for you. The reservation is for Mr. Smith, party of six, for May 1st. That's it. That's the only mention anywhere of an automated assistant. Even if we were to assume and guess. Just to be clear, this part of it was not, this was in the older, the parent patents. No, this was in the continuation in part material. So everything from column. Oh, I thought the CIP stopped at 14 on 30, no? I don't believe so, your honor. I believe it extends all the way, and I may be wrong, but I thought that it extended from the middle of column 13 through the bottom of column 18. I'm sorry, you're right. Yes, sorry. So no, this is in the new material, but of course we have nothing to say anything about that. The rest of the new material are merely examples of what might happen. You might use push buttons. You might say, press one. You might say, say one. You might put in a rule that says, don't call me if it's between nine and five with my reservation. Text me instead. And that's all we have here. We have no explanation of how this is to be accomplished, even if it were in the claims, which it's not. The specification doesn't give us any more detail. It just says, it might be nice to have an automated assistant. Well, that's also the height of abstraction. I would love to have an automated assistant on occasion, but just saying I would like to have one doesn't mean that I've invented it or told anyone about it or taken it out of the realm of the abstract. If your honors have no other questions, I believe that this is nothing more than trying to do what people did forever on pen and paper, using messaging. And I think your honor's suggestion to replace with real-time Chief Judge Moore or your honor Judge Tronto's suggestion of potentially taking it out completely would be the right way to deal with this. And it would leave it not only abstract, but potentially more abstract than it already is. Okay, thank you, Ms. Keefe. Thank you, your honor. I appreciate the time and attention. Mr. Weinblatt. Your honors, we're at the motion to dismiss stage. Amaranth's constructions were supposed to be adopted and applied. They weren't. Judge Tronto, you picked up on that. Amaranth proposed a construction for a rule-capable intelligent automated assistant system. Had that had been applied, that's what the claims would have been directed to. Just like Judge Prost, as you recall, in the earlier case with Domino's, the preamble of the 077 claims that were being considered were used to determine what the claims were directed to. That didn't happen here. That IAA system matters. Now, even if you were to find that the asserted claims are directed to an abstract idea, they survive step two. Even Olo acknowledges in the response brief on page 21 that the results of the claim system have IAA functionalities. And it says that it's capable of doing the features that we've been saying that it's doing. So if the result is able to do the features, that means the how is present. Figure 10 is the design system architecture. It's design choice. And the specification, when it refers to hardware being typically known, refers to workstations and servers. It does not refer to IAA interfaces that accept fixed format. I'm sorry, IAA interfaces that accept free format data or interfaces that accept fixed format data and mobile handsets as being typical hardware because in 2005, they weren't. But your specification doesn't define any IAA hardware anywhere. So how can I conclude that that is the step two innovative aspect when the spec doesn't define it as either hardware or software or at all? Well, Your Honor, with all due respect, the one of ordinary skill in the art, it does. You're talking about a question of fact. Patents are written for those of ordinary skill in the art. They're not written for laypeople, judges, or attorneys. Did you provide an expert? We sometimes see in response to these motion dismisses an expert witness that will say, did you provide any evidence of what you're? Oh yes, we did. If you look at Exhibit C to the complaint. Sorry, not Exhibit C. Exhibit B to the complaint is an expert declaration of Dr. Valerian that goes to. Show me where that is in the appendix, just so I know. Let me get to it. The complaint's on 93, so is the exhibit attached thereafter somehow? Well, do you want to use the first complaint or the amended complaint? I don't know. Whatever the amended complaint. All right, so if you're in the volume one. The amended complaint. Whatever complaint has the expert thing. They both do. Well, wherever you want me to look, you direct me. OK, so it starts at APPX 154. He has summary of opinions on APPX 158. He defines the level of ordinary skill in the art, APPX 159. He then goes over the background of the state of the art to say what the problems were at the time. He even cites where he got the information from, which is evidence. None of this is contested. He then goes into detail as to the 651 patent, starting at APPX 163. He then discusses how it improved the functionality. I'm sorry, where is the specific thing that you told me was in here, which is how maybe it's the IAA is innovative or something like that, such that it was. So you have APPX 166 at paragraph 32. That's one of them. APPX 169 at paragraph 39. APPX 165 to 168 at paragraph 30 to 38. APPX 172 to 174 at paragraphs 43 to 49. As for the attorney argument that the specification of the claims don't say how to implement it, that contradicts what one of ordinary skill in the art says, that APPX 169 at paragraphs 39 and 40. If you look at APPX 169 at paragraph 40, there is a detailed table that shows specification sites, claim language, and where he would look to be able to go out and implement the system, because as one of ordinary skill in the art has declared under oath, the claims provide a roadmap for how to build this. So you have to look at what one of ordinary skill in the art says, not attorney argument, or at the Rule 12 stage, this was unrebited, and it should have been viewed in the light most favorable to Amaranth, and it wasn't. The district court should be reversed, or at a minimum, vacated and sent back down so the factual record could be analyzed and you could actually have an opinion that looks at the facts instead of trying to pigeonhole the claims into a previously decided opinion. So Mr. Weinblatt, I've done a bad job as the presiding judge. I allowed you to go into your step two analysis, and Ms. Keefe doesn't get to respond. You didn't raise it in your opening argument, so I should have cut you off and not allowed you to raise it in your closing. So that's on me. Ms. Keefe, you'll just have to trust that we can try and figure it out on our own. Sorry. But Your Honor, I didn't. I apologize for allowing him to speak on an issue you don't get to respond to. Your Honor, I did mention in my opening, and you can go back, that I did say that it's a framework and it's a design, which is outside of step one. That is step two. Maybe you did. I don't recall. Thank you. This case is taken under submission. Thank you, Your Honors.